UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                                          Case No.   8:10-bk-12985-MGW

WILLIAM A. BERTE, and
PATRICIA A. BERTE,

                     Debtors.                       Chapter 7

WILIAM A. BERTE, and
PATRICIA A. BERTE,
                     Plaintiffs,

vs.                                                             Adv. No. 8:10-ap-00881-ALP

UNITED STATES OF AMERICA,

                     Defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND MEMORANDUM OPINION

THE MATTER before the Court is a Complaint filed by the Debtors, William A. Berte and Patricia A. Berte (together "the Bertes"), to determine the dischargeability of federal income tax liabilities for tax years 1998, 1999, 2000, 2002, 2003, 2004, and 2005. The Bertes claim these liabilities are dischargeable pursuant to § 523(a)(1) and § 507(a)(7) of the Bankruptcy Code. In response, the Defendant, United States of America, contends that the Bertes willfully attempted to evade or defeat the assessment or collection of federal income taxes, and as a result the Bertes' federal income tax liabilities should be excepted from discharge pursuant to § 523(a)(1)(C) of the Bankruptcy

1

Code. Additionally, the United States contends that the tax liabilities for the years 2002, and 2003 are not based on returns filed by the Bertes and should therefore be excepted from discharge pursuant to § 523(a)(1)(B) of the Bankruptcy Code.

A final evidentiary hearing took place on April 20, 2011.

### Findings of Fact

The relevant facts in this case are as follows. The Bertes have federal income tax liabilities for the taxable years 1998, 1999, 2000, 2002, 2003 and 2005, and William Berte, individually, owes a federal income tax liability for the tax year 2004. (Defendant's Exhibits 1–7; Transcript, pp. 11–18). The Internal Revenue Service ("IRS") has assessed federal income taxes and statutory interest against the Bertes as follows:

| Tax Year | Tax Assessed | Interest |
| --- | --- | --- |
| 1998 | $26,392.00 | $4,858.73 |
| 1999 | $41,914.00 | $7,761.55 |
| 2000 | $48,977.00 | $5,476.20 |
| 2002 | $33,406.00 | $3,110.03 |
| 2003 | $29,083.00 | $5,816.60 |
| 2004 | $43,166.00 | $13,641.19 |
| 2005 | $2,023.00 | $147.68 |

Id. Interest continues to accrue as provided by law.

For tax years 2002 and 2003, the Bertes did not file tax returns before their due dates. For tax year 2002, the IRS prepared a Substitute for Return ("SFR") on February 9, 2004. (Defendant's Exhibits 4; Transcript, p. 15). Generally, the IRS bases the SFR's on 1099's and W-2's, and does not allow expenses. (Transcript, p. 16). The IRS assessed taxes based on the 2002 SFR on November 29, 2004. (Defendant's Exbhibit 4; Transcript, p. 15). According to Defendant's Exhibit 4, the Bertes filed a duplicate return on September 20, 2005, and a tax return on December 21, 2006. The IRS accepted the

2

later return and reduced the tax liability on March 19, 2007. (Defendant's Exhibit 4; Transcript, p. 16).

For tax year 2003 the IRS prepared a SFR on August 23, 2004. (Defendant's Exhibit 5). The IRS Account Transcript shows that two duplicate returns were filed, one on September 20, 2005, and a second on December 21, 2006. Id. The IRS assessed taxes on November 5, 2007, after the Bertes submitted the duplicate returns. Id.

Prior to 1998, the Bertes had always timely filed their federal income tax returns and had never been audited by the IRS. (Transcript, pp. 49–52, 144). Mr. Berte was an independent contractor with a trucking company from 1984 or 1985 to sometime in 2005. (Transcript, p. 41). As an independent contractor, Mr. Berte was responsible for maintaining a record of his expenses, and received a 1099 from the trucking company he worked for at the end of each year. (Transcript, p. 45). During the 90's Mr. Berte made on average, $120,000 per year, and for a couple of those years made $150,000. Id.

Mrs. Berte worked as a medical transcriptionist from 1991 to 2002. (Transcript, p. 143). She then worked at Gentiva Home Health from 2002 to 2003. (Transcript, p. 144).

The Bertes filed their income taxes jointly after they got married. (Transcript, p. 144). Prior to 1998, the Bertes used an accountant to prepare their tax returns. (Transcript, p. 47). They knew that they were supposed to pay taxes on the income they received each year. (Transcript, pp. 53, 145).

In 1998, the Bertes went to a financial seminar conducted by Phil Bresnahan. (Transcript, pp. 54, 145). Their intention was to "set up probate so that if [they] did accumulate anything, [they would] be able to just transfer that to family members." (Transcript, p. 53). One of the topics that was discussed at the seminar was taxes. (Transcript, p. 54). Mr. Berte assumed that he would be able to save taxes by participating in what Mr. Bresnahan discussed at the financial seminar. (Transcript, p. 54).

After the seminar, the Bertes discussed what they learned at the seminar and decided to set up a trust with Mr. Bresnahan. (Transcript, p. 56). They paid Mr. Bresnahan several thousand dollars to set up the trust. (Transcript, pp. 56, 146). The trust documents established two trusts, Berte Management Trust ("Berte Trust") and Berte Management Trust 17717 ("Berte Trust 17717"). (Defendant's Exhibit 21). The Bertes were named caretakers and power of attorney for Berte Trust 17717. (Defendant's Exhibit 21). As caretakers, the Bertes were to reside in the "trust headquarters" and serve as resident caretakers in exchange for free rent. (Defendant's Exhibit 21). Additionally, as caretakers, the Bertes were responsible for being financial officers of the trust property, selecting the headquarters, paying all expenses for the headquarters, and opening and maintaining accounts necessary to provide for the headquarters and property. (Defendant's Exhibit 21). The trust documents also directed the Bertes to transfer their residence to Berte Trust 17717 in exchange for "twenty certificates of capital unit," with the understanding that it would be a tax deferred exchange. (Defendant's Exhibit 21).

Mr. Berte, as General Manager of the Berte Trust, signed a lease agreement between the Berte Trust, as lessee, and Berte Trust 17717, as lessor, purportedly leasing office space located at the Bertes residence. (Defendant's Exhibit 21). The trust documents also established an independent contractor agreement between Berte Trust 17717 as the employer, and Mr. Berte as the independent contractor. (Defendant's Exhibit 21). As the independent contractor, Mr. Berte was to manage the day-to-day business of Berte Trust 17717, and he would be compensated $1,000.00 per month for the services. (Defendant's Exhibit 21). In addition to the independent contractor agreement, the Bertes also signed a Management Agreement, and an Investments and Property Management Agreement. (Defendant's Exhibit 21). Both agreements were between Berte Trust and Berte Trust 17717. (Defendant's Exhibit 21). Under the agreements, Berte Trust was to handle all of the day-to-day affairs and management of

Berte Trust 17717. (Defendant's Exhibit 21). Berte Trust 17717 would pay Berte Trust a monthly fee for the services provided. (Defendant's Exhibit 21).[1]

After establishing the trusts, the Bertes transferred all of their assets to the trust, including their home, (Transcript, pp. 66, 147; Defendant's Exhibit 42), and their vehicles (Transcript, pp. 69, 147). They opened a checking account in the name of the trust, closed their personal account and began depositing their income into the trust account. (Transcript, pp. 67–68). The Bertes used the trust checking account to pay their bills and everyday living expenses, with no restrictions. (Transcript, pp. 69, 146).

In 1998, after the trusts were established, Mr. Bresnahan referred the Bertes to Louis Ratfield to prepare their tax returns. (Transcript, p. 71). Mr. Berte took his 1099 and the receipts he normally took to his accountant to Mr. Ratfield to prepare the tax return. (Transcript, p. 71). He was told by Mr. Ratfield that he did not need any of the documentation because all of the Bertes' assets were in the name of the trust and since the Bertes did not own the trust, they did not own anything and did not need the documentation. (Transcript, p. 72). The tax return that Mr. Ratfield prepared showed a significantly lower taxable income and tax liability than in prior years. (Transcript, pp. 73–74, 148). When Mr. Berte questioned Mr. Ratfield about the discrepancy, he was told the same answer, that the Bertes did not own anything. (Transcript, p. 73). The Bertes did not question the procedures used by Mr. Ratfield and did not take the tax return to any other tax professional for review. (Transcript, pp. 73, 149).

---

[1] For an explanation of how the "trust scheme" worked, *see* United States v. Ratfield, 2002 U.S. Dist. LEXIS 21450, *2-7 (S.D. Fla. Sep. 29, 2002).

Mr. Ratfield prepared the Bertes' tax returns from 1998 through the tax year 2005. (Transcript, p. 74). Each year, Mr. Ratfield would send the tax returns to the Bertes, they would sign them and then submit them to the IRS. (Transcript, p. 73). The Bertes did nothing to verify the numbers in the tax returns. (Transcript, p. 74, 149). The Bertes admitted that the adjusted gross income for the tax years 1998, 1999, and 2000 was significantly lower than what they had actually earned. (Transcript pp. 77–79, 149–150).

After or around 2002, the Bertes began to receive letters from the IRS. (Transcript, pp. 79, 151). Mr. Berte gave the letters to Mr. Ratfield, who would write a response and then give it to Mr. Berte to review, sign and send to the IRS. (Transcript, pp. 80–81). The letters from the IRS were similar in nature to Defendant's Exhibit 27, a letter from the IRS to Mr. Berte, dated October 25, 2006. (Transcript, pp. 85–86). The letter stated that the information the Bertes sent to the IRS is frivolous and has no basis in law. It further advised them to seek advice from a tax practitioner or attorney. The Bertes did not seek advice from a tax practitioner or attorney and they did not contact anyone from the IRS to try to resolve the issue. (Transcript, pp. 86–87, 152). They simply gave the letters to Mr. Ratfield to handle. (Transcript, pp. 86–87). The responses that were prepared made statements such as, "I cannot locate any IR Code or regulation that states that the above named individual/entity [is] a 'Tax Payer,'" (Defendant's Exhibit 31) and, "[the 16th Amendment] does not authorize any taxation on an individual's wages or earnings." (Defendant's Exhibit 34). One of the letters even goes so far as to threaten to file a claim for damages in the amount of $200,000 against a Revenue Officer and to seek triple damages, costs and attorneys fees in U.S. District Court. (Defendant's Exhibit 34, p. 7). Mr. Berte testified that he did not understand these letters when he signed them. (Transcript, p. 95). This

statement is difficult to accept considering that Mr. Berte owned his own business and made in excess of $100,000.

In 2003, the Bertes refinanced the mortgage on their home. (Transcript, pp. 98, 152). The refinance agreement stipulated that the equity the Bertes received from their house would be used to pay off certain debts, such as vehicle loans, and $10,000 would be given to their daughter and son-in-law. (Transcript, pp. 98, 121, 153). The Bertes did not pay anything toward their IRS debt because at the time, they did not believe they owed anything to the IRS. (Transcript, pp. 98, 153).

In 2004, the IRS began placing liens on the Bertes' property. (Transcript, p. 99). The Bertes sought the help of a man named Brent Johnson to remove the liens. (Transcript, p. 99). Mr. Berte testified that he stopped using Mr. Ratfield because he knew there was something wrong at that point, "that what [they] were doing in the past wasn't right." (Transcript, p. 99). Mr. Berte had a conversation with someone at a truck stop who recommended Mr. Johnson as someone who could help Mr. Berte with his tax problems. (Transcript, p. 99). Mr. Johnson instructed Mr. Berte to use UCC filings to take the liens off the property. (Transcript, p. 100). Mr. Berte did this, and also sent letters to Experian, TransUnion and Equifax Information Services which stated: "The Public Record Information listings of Tax Liens Filed 07/17/2004, 07/08/2004, and 07/06/2004 are invalid and incorrect." (Defendant's Exhibit 33). Mr. Berte testified that he knew the tax liens were recorded on his property when he sent these letters, but was relying on Mr. Johnson's instruction. (Transcript, p. 103).

On February 21, 2005, and on April 22, 2005, with the help of Mr. Johnson, Mr. Berte sent more letters to the IRS. (Defendant's Exhibits 36, 39). In the first letter, Mr. Berte stated that the IRS was attempting to collect on an alleged debt that he was unaware of. (Defendant's Exhibit 36). Mr. Berte

testified that he had received notices from the IRS informing him of his tax debt. (Transcript, p. 104). In the second letter, Mr. Berte notified the Revenue Officer of his intent to sue him. (Defendant's Exhibit 39). The process with these letters was the same as the letters prepared by Mr. Ratfield. (Transcript p. 105). Mr. Johnson prepared them, and Mr. Berte read and signed them before sending them to the IRS. (Transcript, p. 105).

On September 20, 2005, the IRS received individual income tax returns from Mr. Berte for the tax years 2002, and 2003. (Defendant's Exhibits 11, 12). The tax returns showed zero income from Mr. Berte and the attached Forms 1099-MISC listed zero in nonemployee compensation. The 1099-MISC's show that they are corrected forms and state:

> This corrected Form 1099-MISC is submitted to rebut a document known to have been submitted by the party identified above as 'PAYER' which erroneously alleges a payment to the party identified above as the 'RECIPIENT' of "gains, profit or income" made in the course of a "trade of business."

Some of the 1099-MISCs are from Cook/Tampa Bay Moving Systems Inc. ("Cook"). Mr. Berte testified that he did receive money from Cook during the years 2002 and 2003. (Transcript, p. 109–110).

The tax returns for 2002 and 2003 are signed by Mr. Berte, and do not have a preparer's signature. (Defendant's Exhibits 11,12). Mr. Berte testified that Mr. Ratfield prepared the returns for him, but did not sign or file them because Mr. Ratfield was legally prohibited from preparing tax returns at that time. (Transcript, p. 110).

Mr. Berte's tax return for 2005 also lists zero income, was only signed by Mr. Berte, (Defendant's Exhibit 14), and was prepared by Mr. Ratfield when he was legally prohibited to do so. (Transcript, pp. 112–13).

It appears from the record that at some point, Mr. Berte brought a suit in the United States Tax Court against Commissioner of Internal Revenue to challenge his tax liabilities. (Defendant's Exhibits 40, 41). The court entered summary judgment in favor of the Commissioner and a judgment was entered against Mr. Berte. (Defendant's Exhibit 41). In November of 2005, Mr. Berte filed a Motion for Relief from Judgment and attached as Exhibits amended joint tax returns for tax years 1998, 1999, and 2000. (Defendant's Exhibit 41, p. 5). These tax returns were amended to reflect an adjusted gross income of zero dollars. (Defendant's Exhibit 41). Again, corrected 1099-MISC's were attached to the returns and showed a nonemployee compensation of zero dollars. Id. Also attached were corrected W-2's from Mrs. Berte's employer showing that income taxes were withheld, but that she had earned zero wages for tax years 1998, 1999, and 2000. (Defendant's Exhibit 41; Transcript pp. 155–160). The Bertes testified that they did receive income for tax years 1998, 1999, and 2000. (Transcript, pp. 120, 155–160).

Sometime in 2005, Mr. Berte lost his trucking business. (Transcript, p. 121). Mr. Berte sold his truck and also borrowed money to put down-payments on two bed and breakfasts. (Transcript, pp. 122, 154). The Bertes paid $20,000.00 as a down-payment for one bed and breakfast, and several thousand dollars as a down payment for the other. (Transcript, p. 120). Both down-payments were lost. (Transcript, p. 120). The Bertes did not attempt to pay their tax liability because despite having received notices of the tax debt from the IRS, they still believed they did not owe any taxes. (Transcript, pp. 121, 154).

In 2006, Mr. Berte realized his tax issues were not being resolved and Mr. Johnson referred the Bertes to Gary Jones. (Transcript, p. 122). Mr. Jones represents taxpayers who have tax liabilities and are unable to pay them. (Transcript, pp. 25–26). He specializes in working with the IRS to set up

payment plans, offers in compromise or some other resolution for the taxpayers. (Transcript, p. 26). The tax returns that Mr. Jones prepared for the Bertes reflect the true amount of income that the Bertes earned. (Transcript, pp. 32, 35, 123, 164). The Government admitted into evidence tax returns for 2003, 2004 and 2005, which were prepared by Mr. Jones in 2006. (Defendant's Exhibits 15, 16, 17).

## Conclusions of Law

The Government concedes that the Bertes have no unpaid federal income tax liabilities for the year 2001 and that the tax penalties assessed against the Bertes with respect to tax years 1998, 1999, 2000, 2002, 2003, 2004 and 2005 are dischargeable pursuant to 11 U.S.C. § 523(a)(7)(B). (Doc. No. 31, p. 2 n.1).

Pursuant to § 727(b) of the Bankruptcy Code, a Chapter 7 debtor is generally entitled to a discharge of all debts that arose prior to the filing of the bankruptcy petition. However, there are several exceptions to § 727(b)'s general rule of discharge. The exceptions at issue in this case are contained in 11 U.S.C. §§ 523(a)(1)(B) and 523(a)(1)(C), which provide in relevant part as follows:

**§ 523. Exceptions to discharge**

(a)   A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(1)   for a tax or a customs duty—

. . .

(B)   with respect to which a return, or equivalent report or notice, if required—

(i)   was not filed or given; or

(ii)   was filed or given after the date on which such return, report, or notice was last due, under applicable law or under

> any extension, and after two years before the date of the filing of the petition; or
>
> (C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax;

11 U.S.C. §§ 523(a)(1)(B) and (C). "The Government bears the burden to prove, by a preponderance of the evidence, that a particular claim is non-dischargeable under § 523(a)." In re Griffith, 206 F.3d 1389, 1396 (11th Cir. 2000). Exceptions to the general rule of discharge are to be strictly construed in favor of the debtor. In re Mitchell, 633 F.3d 1319, 1327 (11th Cir. 2011).

## A.     § 523(a)(1)(B)

It is undisputed that the IRS prepared SFR's for the Bertes for tax years 2002 and 2003 pursuant to 26 U.S.C. § 6020(b). For the year 2002, the IRS assessed taxes based on the SFR and abated the tax liability after the Bertes filed tax returns. For the tax year 2003, the IRS prepared an SFR, the Bertes filed two duplicate returns and the tax was assessed thereafter. It is well established that SFR's are not "returns" for purposes of § 523(a)(1)(B). In re Bergstrom, 949 F.2d 341, 343 (10th Cir. 1991); U.S. v. Ralph, 266 B.R. 217, 219 (M.D. Fla. 2001). Therefore, the questions before this Court are whether the return filed by the Bertes post-assessment for tax year 2002, and whether the return filed by the Bertes after the SFR, but before the tax assessment for tax year 2003, are considered "returns" for the purpose of determining dischargeability of tax liabilities under § 523(a)(1)(B).

The Bankruptcy Code does not define the term "return." Therefore, most courts apply a four-prong test known as the "Beard test" to determine whether a debtor's documents qualify as a return. To constitute a "return" under the "Beard test" a document must: 1) purport to be a return; 2) be executed under penalty of perjury; 3) must contain sufficient data to allow calculation of tax; and 4)

must represent an honest and reasonable attempt to satisfy the requirements of the tax law. Beard v. Commissioner of Internal Revenue, 82 T.C. 60 (1984). This test is derived from the principles of two Supreme Court cases: Germantown Trust Co. v. Commissioner, 309 U.S. 304 (1940), and Zellerbach Paper Co. v. Helvering, 293 U.S. 172 (1934)). In re Hindenlang, 164 F.3d 1029, 1033 (6th Cir. 1999). This Court has also adopted the "Beard test." In re Sgarlat, 271 B.R. 688 (Bankr. M.D. Fla. 2001).

The Government does not argue that the Bertes' late-filed tax returns do not meet the first three prongs of the "Beard test." It contends that the Bertes' post-assessment filings are not returns because they do not meet the fourth prong of the "Beard test" in accordance with the case of In re Hindenlang, 164 F.3d 1029 (6th Cir. 1999). In Hindenlang, the Sixth Circuit Court held as a matter of law that:

> [A] Form 1040 is not a return if it no longer serves any tax purpose or has any effect under the Internal Revenue Code. A purported return filed too late to have any effect at all under the Internal Revenue Code cannot constitute "an honest and reasonable attempt to satisfy the requirements of the tax law." Once the government shows that a Form 1040 submitted after an assessment can serve no purpose under the tax law, the government has met its burden.

Id. at 1034.

The Government argues that the Bertes' late-filed income tax returns were not helpful and served no purpose to the IRS because they were filed after the IRS had already assessed taxes. The Government further argues that the tax liabilities for 2002 and 2003 are not dischargeable because they are not based on the tax returns filed by the Bertes. This Court disagrees with both arguments.

First, for tax year 2002, the Government contends that although the IRS abated the tax liability, the remaining portion is still based on the original assessment, not the late-filed income tax return. While this may be true, it is also true that the tax liability was reduced based on the income tax return

that was filed by the Bertes. Therefore, the income tax return the Bertes filed for tax year 2002 was in fact helpful to the IRS, and was in fact used by the IRS to determine the Bertes final tax liability.

Second, with respect to tax year 2003, according to the IRS Account Transcript for tax year 2003, (Defendant's Exhibit 5), the taxes were assessed *after* the Bertes filed their income tax returns, not before. The Government did not present any evidence to show that the assessment was not based on the income tax return the Bertes filed. Based on the fact that the 2002 tax liability was abated based on a late-filed tax return, without more, the Court can only make the assumption that since the tax assessment was made post filing, the IRS took into consideration the late-filed income tax returns. Therefore, the 2003 late-filed returns also served a purpose to the IRS.

The Bertes filed at least two late-filed returns for both the 2002 and 2003 tax years. The first returns were zero income returns, which were incorrect and misstated the Bertes' income. The second returns, which were prepared by Gary Jones, reflected the Bertes' true income for tax years 2002 and 2003. The Government does not distinguish between these two returns. The 2002 corrected return that was filed on December 21, 2006, is not admitted into evidence. The 2003 corrected return, which was also filed on December 21, 2006, was admitted into evidence, (Defendant's Exhibit 15), and appears to meet the first three prongs of the "Beard test." Based on the evidence provided, this Court can only conclude that the corrected returns did represent an honest and reasonable attempt of the Bertes to satisfy the requirements of the tax law. This is especially so since the IRS accepted the returns, abated the 2002 tax liability based on the corrected return that the Bertes filed, and assessed taxes for 2003 after the Bertes filed their corrected return. Therefore, the late-field income tax returns for 2002 and 2003 are "returns" for purposes of § 523(a)(1)(B). However, the issue of whether the Bertes' income

tax liabilities—which include tax years 2002 and 2003—are nondischargeable pursuant to § 523(a)(1)(C) still remains.

**B.     §523(a)(1)(C)**

The Government has not claimed that the Bertes filed a fraudulent return. Therefore, to determine the dischargeability of the Bertes' past due taxes, this Court will only look to the second part of § 523(a)(1)(C)—whether the Bertes willfully attempted in any manner to evade or defeat such tax. In order to prove that a debtor has willfully evaded his taxes pursuant to § 523(a)(1)(C), the Government must show that the debtor engaged in: 1) evasive conduct with; 2) a mental state consistent with willfulness. Mitchell, 633 F.3d at 1327; In re Jacobs, 490 F.3d 913 (11th Cir. 2007).

   1.     Conduct Requirement

"The government satisfies the conduct requirement when it proves the debtor engaged in affirmative acts to avoid payment or collection of taxes, either through commission or culpable omission." Jacobs, 490 F.3d at 921. The mere non-payment of taxes is insufficient to satisfy the conduct requirement. Mitchell, 633 F.3d at 1326; Griffith, 206 F.3d at 1395; In re Haas, 48 F.3d 1153, 1158 (11th Cir. 1995). However, non-payment in conjunction with some other affirmative action, such as a failure to file tax returns, see Mitchell, 633 F.3d at 1327; see also In re Fretz, 244 F.3d 1323, 1329–30 (11th Cir. 2001), or where the debtor has taken measures to conceal assets or income from the IRS is sufficient. In re Birkenstock, 87 F.3d 947, 952 (7th Cir. 1996).

It is undisputed that the Bertes failed to pay taxes for the tax years 1998, 1999, 2000, 2002, 2003, 2004 and 2005. There is also evidence that the Bertes altered their tax documentation to either reflect a significantly lower income than they actually earned, or to reflect a zero income from their employers. The Bertes transferred all of their assets to a trust and deposited all of their income into a

trust account, from which they paid all of their personal expenses. While Mr. Berte testified that the purpose of establishing the trust was to set up probate for he and his wife, based on how the trusts were created and the use of the trusts, this Court is satisfied that the purpose of establishing the trusts were to evade or defeat taxes. Additionally, the Bertes knowingly sent false and frivolous letters to the IRS asserting they did not have a tax liability. The Bertes testified that the letters were prepared by Mr. Ratfield and Mr. Johnson, but the Bertes knew the information contained in the letters to be false yet they sent the letters anyway. They did not consult with any other tax professional or attorney. These affirmative actions are sufficient to satisfy the conduct requirement of § 523(a)(1)(C).

    2.    The Mental State Requirement

"The mental state requirement—willfullness—is satisfied where the government shows that the debtor's attempt to avoid tax liability was 'done voluntarily, consciously or knowingly, and intentionally.'" Jacobs, 490 F.2d at 921 (quoting Fretz, 244 F.3d at 1329–30). The required mental state is met when the Government proves that the debtor: 1) had a duty under the law; 2) knew he had that duty; and 3) voluntarily and intentionally violated the duty. Mitchell, 633 F.3d at 1327; Jacobs, 490 F.2d at 921; Griffith, 206 F.3d at 1396.

During the final evidentiary hearing, the Bertes testified that they had a duty to pay income taxes and that they knew of that duty. Therefore, the only issue for this Court to decide is whether the Bertes voluntarily and intentionally violated their duty to pay income taxes.

"[A] debtor's tax debts are non-dischargeable if the debtor acted knowingly and deliberately in his efforts to evade his tax liabilities." Mitchell, 633 F.3d at 1328. A finding of fraudulent intent is not required and a debtor who makes inadvertent mistakes does not meet the willfulness requirement. Id. In making this determination courts have considered the "badges of fraud" in addition to affirmative

acts of fraud. See Zimmerman v. U.S., 204 B.R. 84, 88 (Bankr. M.D. Fla. 1996); see also Griffith v. U.S., 161 B.R. 727, 733 (Bankr. S.D. Fla. 1993) aff'd, 206 F.3d 1389 (11th Cir. 2000). The badges of fraud include:

> (1) the recurrence of the understatement of income for more than one tax year; (2) the understatement of income; (3) implausible or inconsistent explanations of behavior; (4) inadequate records; (5) transfer of assets to a family member; (6) transfer for inadequate consideration; (7) transfer that greatly reduced assets subject to IRS execution; and (8) transfers were made in the face of serious financial difficulties.

Griffith, 161 B.R. at 88.

Before addressing whether the Bertes acted knowingly and deliberately in their efforts to evade their tax liabilities, this Court will first address the Bertes' reliance on a professional as to tax matters defense. The Bertes rely on the case of Zimmerman v. United States, 204 B.R. 84 (Bankr. M.D. Fla. 1996), to argue that they believed that Mr. Bresnahan and Mr. Ratfield were financial planning and tax professionals and that their reliance on such professionals should be a defense to willful evasion under § 523(a)(1)(C). (Doc. No. 3). This Court disagrees.

Reliance on a professional as to tax matters may be a defense to willful evasion of taxes, but the reliance must be reasonable. Zimmerman, 204 B.R. at 88. The Zimmerman case involved a debtor who relied on professionals to assess his coal mining properties, and took tax deductions based on those assessments. Id. at 87. The IRS later disallowed the tax deductions based on an audit it conducted. Id. In determining whether the debtor met the willfulness requirement under § 523(a)(1)(C), the court stated that willfulness does "not include acts that are made through 'inadvertence, carelessness, or honest misunderstanding of what the law requires,' but instead requires an affirmative act." Id. at 88. The court concluded that the debtor did not meet the willfulness

16

requirement because there was no evidence of fraudulent behavior or "badges of fraud" conducted by the debtor. Id. The debtor fully cooperated with the IRS and fully participated in the IRS's audit. Id. The court also found that the debtor's reliance on the professional was reasonable because: coal mining is speculative and risky; the debtor had no experience in coal mining and his attempt to lessen the risk by hiring a professional was reasonable; and no evidence was presented to challenge the qualifications of the professional the debtor used. Id. at 88–89.

In this case the Bertes' reliance on Mr. Bresnahan and Mr. Ratfield was not reasonable. Prior to 1998, the Bertes had filed their income tax returns timely and relied on an accountant they used for several years. Prior to 1998, they had never been audited by the IRS. In 1998, Mr. Ratfield began preparing the Bertes' tax returns and reported a significantly lower annual income and tax liability, yet the Bertes income had not decreased. The Bertes questioned the discrepancy and they were told that because the income they received was deposited into the trust account they did not own it and did not need to pay taxes on it. The Bertes assumed this to be correct. Perhaps relying on Mr. Ratfield in the beginning was reasonable, but the Bertes continued to rely on him, even when they knew he was legally prohibited from preparing tax returns. In addition, as early as 2002, they received letters from the IRS which stated their arguments regarding their tax liabilities were frivolous and had no basis in law. They were advised by the IRS to seek the advice of a tax professional or attorney. The Bertes did not seek the advice of any other tax professional or attorney, but continued to rely on Mr. Ratfield. They did not cooperate with the IRS, but continued to fight their tax liabilities until they hired Mr. Jones to help them. This case is very different from Zimmerman, and the Bertes' reliance on Mr. Ratfield and Mr. Bresnahan was unreasonable.

Having concluded that the Bertes' reliance on Mr. Ratfield was unreasonable, the Court now turns to the issue of whether the Bertes acted knowingly and deliberately in their efforts to evade their tax liabilities. The Bertes transferred all of their assets to a common law trust in 1998 based on a financial seminar they attended. They significantly understated their income for the tax years, 1998, 1999, and 2000. For the years 2002 through 2005, the Bertes filed tax returns showing zero income even though they knew they had received income. Along with those returns they filed corrected 1099's to show that Mr. Berte received zero nonemployee compensation from his third party employers. The Bertes also amended their tax returns for tax years 1998, 1999 and 2000 to show zero income, again knowing that they received income. They even submitted false W-2's for Mrs. Berte to reflect that her employer paid her nothing, and false 1099's to reflect zero nonemployee income for Mr. Berte. The Bertes admitted that they had received income for all years at issue.

Even more compelling in this case is the Bertes' unwillingness to cooperate with the IRS. As stated earlier, as early as 2002, the Bertes began receiving letters from the IRS stating that the responses they were receiving from the Bertes were frivolous and had no basis in law. Instead of seeking the advice of a tax professional or attorney, as the IRS advised, they chose to continue to rely on Mr. Ratfield. They even chose to rely on Mr. Ratfield to prepare their tax returns in 2005 when they knew he was legally prohibited to do so. When the IRS placed liens on the Bertes' property, instead of working with the IRS, they sought the help of Mr. Johnson, who instructed the Bertes to make UCC filings to remove the liens. At that time, the Bertes also sent false letters to credit reporting agencies. The Bertes even filed a law suit in the United States Tax Court to challenge their tax liabilities. Only when they realized that nothing Mr. Ratfield or Mr. Johnson instructed them to do was helping their tax liabilities did they seek the help of Mr. Jones. Based on the foregoing, this Court is

satisfied that the Bertes acted knowingly and deliberately in their efforts to evade their tax liabilities. Therefore, the liabilities for income tax and interest for the tax years, 1998, 1999, 2000, 2002, 2003, 2004 and 2005 are within the exception of § 523(a)(1)(C) and are nondischargeable.

Accordingly:

**IT IS ORDERED, ADJUDGED AND DECREED** that the Plaintiff's late-filed income tax returns for tax years 2002 and 2003 are returns for purposes of § 523(a)(1)(B). It is further

**ORDERED, ADJUDGED AND DECREED** that the Plaintiffs' income tax and interest liabilities for tax years, 1998, 1999, 2000, 2002, 2003, 2004, and 2005, are excepted from discharge pursuant to § 523(a)(1)(C) of the Bankruptcy Code, and are therefore nondischargeable in the Debtors' Chapter 7 case. It is further

**ORDERED, ADJUDGED AND DECREED** that the penalties for the years involved be, and the same are hereby, dischargeable pursuant to § 523(a)(7)(B) of the Bankruptcy Code. It is further

**ORDERED, ADJUDGED AND DECREED** that a separate Final Judgment will be entered in favor of the Defendant, United States of America, and against the Plaintiffs, William A. Berte and Patricia A. Berte, on this issue.

**DONE AND ORDERED** this 7th day of July, 2011.

_____
ALEXANDER L. PASKAY
United States Bankruptcy Judge